UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JACK FISCHER,

        Plaintiff,

  -against-

NYC DEPARTMENT OF EDUCATION,
MELISSA SILBERMAN, and AUGUSTUS
LABELLA, in their individual and official
capacities,

        Defendants.
-------------------------------------------------------------X

**MEMORANDUM & ORDER**

06 cv 3964 (RJD)(VVP)

DEARIE, Chief Judge.

Plaintiff filed this action on August 16, 2006, claiming retaliation under the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2611, as well as discrimination based on disability and retaliation under the New York State Human Rights Law, New York Executive Law §§ 290, and § 8-107 of the New York City Administrative Code ("New York human rights laws" and "HRL claims"). Defendants have moved for summary judgment. For the following reasons, the Court grants defendants' motion in its entirety.

I.  **BACKGROUND**

Plaintiff is a 56 year old retired New York City Department of Education ("DOE") vocational education teacher, licensed to teach auto mechanics. (Defs.' Mat. Facts ¶ 1.) DOE hired plaintiff in September 1971, and thereafter assigned him to Automotive High School ("AHS"). (Id. ¶ 2.) Plaintiff taught in shop classrooms, which were different from ordinary high school classrooms in that they were very large, containing several cars and lifts to raise them, as well as an area for instruction. (Id. ¶ 3.) Plaintiff was diagnosed with multiple sclerosis ("MS")

around 1995. (See Deposition of Jack Fischer, Jun. 18, 2007, Pl.'s Resp., Attach. 9-17 (Dkt. No. 47) (hereinafter "Fischer Dep.") 78:3.) As a result, he experiences vertigo, fatigue, memory loss and numbness in his legs, occasionally losing the use of his legs altogether. (Id. at 78:11-12; 81:25-82:2.)

## A. Requests for Accommodations

The amended complaint identifies four types of accommodations requested by plaintiff during his employment at AHS: (1) an early teaching schedule; (2) a cooler classroom and/or air conditioning in his classroom; (3) a classroom on the first floor of the AHS building; and (4) a paraprofessional to assist plaintiff with his classroom duties. (See, e.g., Pl.'s Resp., Ex. 4 (hereinafter "Compl.") ¶¶ 13, 15-17, 20, 21, 22, 35 & 36.)[1]

The procedures for requesting reasonable accommodations at DOE are set forth in DOE Personnel Memorandum No. 51. (Defs.' Ex. K.) The memorandum states, in part: "the employee has the right to formally apply for an accommodation through the Medical Bureau by completing the attached Accommodation Request Form and attaching medical documentation to support the request." (Id.) On only one occasion, on December 21, 2000, did plaintiff properly follow Personnel Memorandum No. 51 when making a request for accommodations. (See Defs.' Mat. Facts ¶ 25-27; Defs.' Ex. L, Reasonable Accommodation Request, Dec. 21, 2000 (seeking a cooler classroom and an early teaching schedule).) In response to the request, the Medical Bureau examined plaintiff, determining that "accommodation was not medically warranted." (See Defs.' Ex. M.) Plaintiff continued to make requests for accommodations in the years that

---

[1] The amended complaint also refers to plaintiff's request for a "handicap parking spot," but acknowledges that the request was "eventually granted." (Compl. ¶¶ 13-14.)

2

followed, but did not follow the procedures established in Personnel Memorandum No. 51.

*1.    Early teaching schedule*

AHS teachers followed an eight-period daily schedule, with five periods for teaching and one period each for preparation, lunch and professional development. (See Defs.' Mat. Facts ¶ 5; Fischer Dep. 97:2-12.) Teachers could follow one of several teaching schedules. (Defs.' Mat. Facts ¶ 7 (citing three schedules: (1) 7:05am-1:55pm; (2) 7:54am-2:44pm; and (3) 8:43am-3:33pm).) Several factors dictate the schedules assigned to teachers at AHS, including the number of students and their academic needs. (See Deposition of Melissa Silberman, Jun. 19, 2007 and Oct. 11, 2007, Pl.'s Resp., Attach. 5-6 (hereinafter "Silberman Dep.") 9:12-25 & 12:9-13:3; Deposition of Augustus Labella, Jun. 19, 2007, Pl.'s Resp., Attach. 7-8 (hereinafter "Labella Dep.") 14:6-17:18.)

Each term between 2002 and 2006, plaintiff requested and received the earliest teaching schedule because his symptoms grew worse later in the day. (See Defs.' Mat. Facts ¶¶ 8-9; Fischer Aff. ¶ 18.) However, while his schedule commenced at 7:05 a.m., his first period of teaching occasionally did not begin until period 1 or 2, slightly later in the morning. (See Defs.' Ex. SS, Decl. of Paul Heymont, May 4, 2009 (hereinafter "Heymont Decl.") ¶¶ 6-10 & ¶10 n.2; Defs.' Ex. UU, Master Schedule for Fall 2002-Spring 2004; Defs.' Ex. TT, Master Schedules for plaintiff, Fall 2004-Spring 2006.) If no shop class within plaintiff's certification was offered during the early periods of the day, he would be assigned either a professional development or a preparation period. (See Labella Dep. 17:19-25; Heymont Decl. ¶¶ 5, 7.)

In 2002, plaintiff filed a Charge of Discrimination with the EEOC, alleging that he was discriminated against because AHS had not given him an early schedule. (See Fischer Dep.

3

145:16-18; Pl.'s Resp., Ex. 1.) Plaintiff withdrew the charge, however, because plaintiff was granted an earlier teaching schedule and on the understanding that defendants would provide other requested accommodations. (See Amended Compl. ¶ 27; Defs.' Ex. G (Letter, dated Feb. 21, 2003, on behalf of EEOC, acknowledging withdrawal "because the matter has been resolved"); Fischer Aff. ¶ 4; see also Fischer Aff., Ex. 20 (Letter, dated Feb. 5, 2003, informing plaintiff that his schedule had been adjusted in accordance with his request).) This was the only time plaintiff filed a discrimination charge with the EEOC, and he at no time filed a complaint of discrimination with the State Division of Human Rights, the City Commission of Human Rights or with the DOE Office of Equal Employment. (See Defs.' Mat. Facts ¶ 38; Fischer Dep. 147:5-151:25.)

On September 13, 2004, plaintiff again requested an early teaching schedule for the 2004-05 school year. This request was granted, as memorialized in a letter from Assistant Principal Labella to plaintiff dated September 23, 2004. (See Defs.' Ex. H (plaintiff's request); Defs.' Ex. I (Labella letter).) On September 7, 2005, plaintiff wrote to Principal Silberman, in part to thank her for accommodating his request for an early teaching program for the 2005-2006 school year. (See Defs.' Ex. J ("I want to thank you for continuing to accommodate me with the earliest teaching program.").)

Plaintiff acknowledged at a deposition that AHS granted each request he made for an early teaching schedule within one month of the request, though he had to repeat his request for each new semester. (See Fischer Dep. 99:7-17; Fischer Aff. ¶ 18.) Plaintiff also stated at his deposition that he got "whatever [he] had to" from the school since 2002, including an early schedule. (See Fischer Dep. 156:12-18.)

4

2.  *Air conditioning*

Over the course of his employment at AHS, plaintiff requested a cooler room as an accommodation, claiming that heat tends to exacerbate symptoms of MS such as vertigo and fatigue. He included this request in his 2002 EEOC Charge of Discrimination, but later withdrew the charge entirely. (See Defs.' Ex. G.) He made a similar request in his letter of September 7, 2005, stating, "the heat in my classroom is damaging to a person with MS and makes me even more fatigued; therefore, I will at least need a fan. A perfect scenario would be an air conditioner." (See Defs.' Ex. I.) On November 14, 2005, plaintiff again requested "a first floor classroom with air-conditioning available to me at all times." (See Defs.' Ex. N.)

Defendants assert that the request for an air-conditioned classroom "could not be accommodated because the building is old and is not wired to install the large air conditioner which would be appropriate to cool the huge shop classrooms." (See Defs.' Mat. Facts ¶ 29; Labella Dep. 32:5-13 ("[H]e requested air conditioning, so we went to the building the [*sic*] custodial engineer, and we asked him about it, and that's when he put in a request to have the building evaluated for electrical and see if they could do an upgrade [but]. . . the City has to do a Capital Project to do it.").) Though most of the shop rooms were not air-conditioned, according to plaintiff, the Toyota classroom on the second floor of the AHS building did have air conditioning. (See Fischer Dep. 131:19-132:3.) Plaintiff was provided a fan to cool the shop classroom, which he acknowledged in his September 7, 2005 letter to be adequate, though not "perfect." (See Labella Dep. 38:11-39:3; Defs.' Ex. I.)

3.  *First-floor classroom*

Plaintiff also requested a room on the first floor. (See, e.g., Defs.' Ex. N; Fischer Aff.,

5

Ex. 21.) While there were shop classrooms on the first floor, the shop for the front end brake class, a class plaintiff specifically requested to teach, was on the second floor. (See Fischer Aff., Ex. 23 (Letter, dated Oct. 30, 1997, from Assistant Principal Labella to Yvonne Joseph, Medical Bureau Administrator, regarding first floor accommodations) (hereinafter "Oct. 30, 1997 Labella ltr."); Fischer Dep. 115:18-116:3; 116:19-23.) When making the request, however, plaintiff states that he was unaware that there were no front end break classrooms on the first floor. (See Fischer Aff. ¶ 19.)

With respect to plaintiff's requests for a classroom on the first floor, defendants suggest that a room was not available because plaintiff's collective bargaining agreement provides that any teacher occupying the same shop room two years in a row holds retention rights in the classroom. (See Fischer Dep. 152:7-9; Silberman Dep. 17:4-18:2; Labella Dep. 20:6-14.) Plaintiff claims that retention rules apply only "when not inconsistent with the needs of the school." (See Fischer Aff., Ex. 22 at 2 ("Teachers Contract," Art. 7(A)(3)(a)).)[2] Assistant Principal Labella did inquire into the possibility of a room reassignment, speaking first to the union and then to the teachers holding retention rights to the first floor shop rooms. (See Labella Dep. 22:4-20.) However, according to Labella, the union representative confirmed that the occupant teachers held retention rights, and when Labella asked those teachers to surrender their rooms to Mr. Fischer, "[t]hey said no." (Id. at 32:20.)

Although plaintiff never received a classroom assignment on the first floor, he was given

---

[2]The Court notes that while plaintiff's Exhibit 22 appears to be an excerpt from a longer contract and makes reference to retention rights in shop classrooms, there is no indication that this contract applied to AHS; it is merely entitled "Teachers Contract 6/1/2003-11/12/2007" with no cover page. (See Fischer Aff., Ex. 22.) As such, the document does not provide reliable support for plaintiff's contention.

a key to the only available elevator. (See Labella Dep. 22:23-24:20; Oct. 30, 1997 Labella ltr. ("We have no passenger elevator in our school and we are not barrier free. We are concerned that the debilitating effects of multiple sclerosis coupled with the strenuous demands required of an Automotive Shop Teacher working with dangerous equipment may lead to serious injury for either the teacher or the students."); Fischer Aff., Ex. 24, Dec. 5, 1997 Letter from Principal Barbara Alleyne to the Medical Bureau regarding accommodations for plaintiff (hereinafter "Dec. 5, 1997 Alleyne ltr.") ("Our one elevator is a vehicle elevator designed to carry automobiles and small trucks from floor to floor. This elevator, while having a door to the outside, can only be operated form inside the building. One cannot call the elevator from outside the building.").) Shortly after plaintiff first informed AHS of his disability, then-Principal Barbara Alleyne stated in a letter to the Medical Bureau that plaintiff would have to climb two flights of stairs to access even the first floor auto mechanic shops. (See Dec. 5, 1997 Alleyne ltr.) It is unclear whether this remains the case today.

*4. Assignment of a paraprofessional*

Plaintiff also made a series of requests for a paraprofessional to assist him with his classroom duties. (See, e.g., Defs.' Ex. J (Sept. 7, 2005); Defs.' Ex. N (Nov. 14, 2005).) AHS does offer paraprofessionals to assist students with special needs; however, paraprofessionals are not made available for teachers. (See Siblerman Dep. 20:16-21:10 ("[W]e literally have to include the OSIS number, which is the school system's ID number for a child in the budgeting of [a paraprofessional]."); Labella Dep. 27:16-30:15 ("I'm not aware of any regulations that permit the school to assign paras based on a teacher's need."), Deposition of Evaristo Jimenez, Jun. 21, 2007, Pl.'s Resp., Attach. 2 (hereinafter "Jiminez Dep.") 22:9-23:16.) AHS never provided a

paraprofessional to assist plaintiff in his classroom based on *plaintiff's* disability-related needs (plaintiff occasionally had a paraprofessional in the classroom based on his students' needs).

**B.   Plaintiff's Request for FMLA Leave Forms and Alleged Retaliation**

In January 2006, plaintiff approached payroll secretary Pat Wilders to ask about FMLA leave forms. Ms. Wilders gave plaintiff the forms, though plaintiff never returned them. (See Defs.' Ex. D, Deposition of Pat Wilders, dated Oct. 11, 2007 (hereinafter "Wilders Dep.") 6:24-25; 7:18-23.) At his deposition, plaintiff even stated that he did not read the forms, that he "just wanted to look at the papers and see [his] options," and that it was "just a glimpse of an idea." (Fischer Dep. 208:18-209:14 ("Q. Would you say you thought about doing it but never pursued it? A. Exactly.").) Ms. Wilders never told Principal Silberman that plaintiff had asked for leave forms, and plaintiff stated at his deposition that he told neither Principal Silberman nor Assistant Principal Labella about the forms. (See Wilders Dep. 7:24-8-:4; Silberman Dep. 88:25-89:25; Fischer Dep. 209:17-25.)

Around January 2006, plaintiff was removed from the school's direct deposit program. According to Pat Wilders, this was because plaintiff had a zero sick leave balance. (Wilders Dep. 11:8-12:13.) Ms. Wilders stated that other employees were removed from direct deposit pursuant to the same "school policy" but she could not identify a written policy setting forth this rule. (Id. 11:17-12:22.) Plaintiff stated at his deposition that Principal Silberman told him that she removed him from direct deposit herself, even though he had "one or two" days left in his leave balance at that point. (See Fischer Dep. 40:1-21.) Removal from direct deposit did not alter the amount of pay plaintiff received; he received one check two days later and another check nine days later than the direct deposit date. (See Fischer Dep. 39:3-24; 46:3-9.) In April 2006,

8

plaintiff re-enrolled in direct deposit, but when his leave balance again returned to zero, Ms. Wilders removed him from the program a second time. (See Wilders Dep. 14:22-15:24; 17:19-18:2; 16:11-16; 18:3-21.)

During the Spring 2006 term, plaintiff was assigned to the Absent Teacher Reserve ("ATR"), a substitute teacher pool for teachers without a "regular or specific program" for a given term. (See Silberman Dep. 74:12-75:5.) Assignment to ATR is not a disciplinary action, and, according to Principal Silberman, "It could be as a result of the program already being made and the teacher being returned, and then you have to find work for them to do, a teacher coming back from leave and we don't have classes for them, so we provide them with ancillary work to help the school out." (Id. 74:22-75:5.) Plaintiff did not file a grievance as a result of this action. (See id. 75:20-24; 93:17-24.)

The amended complaint also alleges that defendants brought disciplinary charges against plaintiff "in retaliation for plaintiff's opposition to discriminatory practices and his filing of the instant action." (See Amended Compl. ¶ 52.) The original complaint in this action was filed on August 16, 2006. Disciplinary charges were brought against plaintiff on December 6, 2006.

## C.  Plaintiff's Discrimination Allegations and Employment Evaluations, 2004-06

Plaintiff received a Satisfactory rating for his 2003-04 annual teaching evaluation. (See Defs.' Ex. O.) However, for the following two academic years plaintiff received Unsatisfactory evaluations. (See Defs.' Exs. Y, LL.)

According to former Assistant Principal Daniel Albetta, who attended weekly "cabinet meetings" of the school administrators during the Spring 2006 term, Principal Silberman occasionally stated in these meetings that she "wanted [plaintiff] gone" and expressed her

9

skepticism that he was suffering from MS. (See Pl.'s Resp., Attach. 1 (hereinafter "Albetta Dep."), 9:14-14:5; 18:22-19:8.) Albetta worked at AHS from February 29, 2006 until January 12, 2007. (Id. 5:17-18.) During his deposition, plaintiff stated that Principal Silberman and Assistant Principal Labella never made direct comments to him suggesting a discriminatory animus. (See Fischer Dep. 62:2-4; 62:24-63:8.) Assistant Principal Labella testified that he discussed retirement informally with plaintiff, asking plaintiff if he had enough years to retire, and stating "especially given your disability. You should pack it in." (See Labella Dep. 56:22-57:5.) On June 28, 2006, Principal Silberman requested a medical examination of plaintiff pursuant to Education Law § 2568. Her request stated, in part,

> Mr. Fischer has been observed sleeping in class while children remain unsupervised. He states this is a result of his MS condition and that he can not [*sic*] control [it]. Mr. Fischer is an avid SCUBA diver who has professed an interest in activities that require a great deal of physical exercise, yet he can not [*sic*] remain awake in class...

(Defs.' Ex. MM, Letter from Principal Silberman, dated June 28, 2006.)

The record contains documentary evidence of several instances of plaintiff's alleged misconduct during the 2004-05 school year, including (1) telling Principal Silberman that he would accuse her of discrimination if she attempted to hold him to certain expectations (Defs.' Ex. P, Letter from Principal Silberman, dated April 11, 2005); (2) telling an assistant to Ms. Silberman that the Principal can "put it where the sun don't shine" with reference to a letter from Silberman to plaintiff (Defs.' Ex. Q, Letter from AP Labella to Silberman, dated April 18, 2005); (3) a sustained allegation of verbal abuse by a student against plaintiff (Defs.' Ex. W, Alleged Corporal Punishment and/or Verbal Abuse Report of Investigation); (4) failing to adhere to the school's grading policy (e.g. Defs.' Ex. X, Letter from AP Labella, dated May 13, 2005).

Similar incidents occurred during 2005-06 school year. Plaintiff was observed sleeping in class on two occasions, a fact which he does not dispute. (Defs.' Ex. EE, Letter from Principal Silberman, dated May 15, 2006.) He received another sustained allegation of corporal punishment. (Defs.' Exs. CC, HH, Alleged Corporal Punishment and/or Verbal Abuse Report of Investigation (forcefully pulling a student's book bag strap and pushing the student into a chair).) On May 23, 2006, Pat Wilders filed a complaint stating that she was verbally harassed and threatened by plaintiff. (See Defs.' Ex. II, Memorandum of Pat Wilders, dated May 23, 2006; Defs.' Ex. KK, Letter from Principal Silberman, dated June 23, 2006 (sustaining complaint of misconduct by Pat Wilders).)

**D.     Education Law § 3020 Charges and Specifications against Plaintiff**

Based on plaintiff's "conduct unbecoming his profession and neglect[] [of] his duties" during the 2004-05 and 2005-06 school years, Charges and Specifications were preferred against plaintiff. (See Defs.' Ex. QQ (Charges and Specifications).) On December 6, 2006, plaintiff was served with the disciplinary Charges and Specifications, finding plaintiff's behavior to be just cause for termination. (Id.) Many of the specifications related to plaintiff's alleged abusive treatment of students. (Id., Specifications 1, 2, 3, 4(a)-(h), 5(a)-(e), 6 & 8.) Others involved insubordination, insolence to supervisors and dereliction of his own supervisory responsibilities towards students. (Id., Specifications 7, 9-15.) Thereafter, pursuant to Education Law § 3020-a, a Hearing Officer, Howard Edelman, was designated to arbitrate the § 3020-a proceeding, where plaintiff was represented by counsel. (See Defs.' Mat. Facts ¶¶ 96-97; Defs.' Ex. RR, Jan. 29, 2006, Decision of Hearing Officer Howard Edelman.)

Hearing Officer Edelman found plaintiff guilty of many, though not all, of the

specifications, including allegations of verbal (but not physical) abuse of students and insubordination. (See id. at 32, 34.) Mr. Edelman recommended a penalty of six months suspension without pay, finding discharge "incongruous . . . in this matter given the nature of Respondent's misdeeds." (See id. at 32-33.) Plaintiff did not challenge the decision, though he could have done so pursuant to Education Law 3020-a(5).

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000) (quoting Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991)).

The court "must first resolve all ambiguities and draw all inferences in favor of the non-moving party . . . ." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). However, in opposing a motion for summary judgment, the nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the adverse party's pleading." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (quotation marks and citation omitted). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue of fact for trial." Fed. R. Civ. P. 56(e). "If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.1998) (internal quotations and

citations omitted) (alteration in original).

### III. DISCUSSION

Based on the undisputed facts of record, plaintiff's FMLA claim—the only federal claim in this case—cannot survive. Plaintiff never submitted the leave forms, never even *read* the leave forms, and admitted under oath that he deliberately did not pursue the idea. This is simply insufficient to establish the first element of the retaliation claim: engagement in a protected activity under the FMLA. At oral argument, counsel for plaintiff urged the Court to view the filing of the present action as a protected activity under the FMLA, although no authority for this contention appears in the papers. Assuming *arguendo* that Mr. Fischer could establish the first element of his prima facie case, the disciplinary charges preferred against him, many of which were sustained, were the culmination of at least two years of progressive discipline, belying the suggestion that a causal connection exists between this action and the § 3020-a proceeding.

Plaintiff's state law claims of retaliation, lack of reasonable accommodation and discrimination likewise cannot proceed because plaintiff never filed a notice of claim under Education Law § 3813, rendering all HRL claims procedurally barred. Though plaintiff offers no explanation for his failure to notice the claims, he asks the Court to overlook the error and grant leave to file a late notice of claim. Especially considering the fact that plaintiff's federal claim is unsustainable, ignoring the failure to notice claims would amount to a significant, and unwarranted, extension of federal jurisdiction.

### A. FMLA Retaliation Claim

To establish a prima facie case of retaliation under the FMLA, plaintiff must show that: (1) he exercised a right protected under the FMLA; (2) he was qualified for his position; (3) he

suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. Robert v. Health Association, 2009 U.S. App. Lexis 1944 (2d Cir. 2009); Potenza v. City of New York, 365 F.3d 165, 169 (2d Cir. 2004). Requesting a leave *form*, without more, cannot satisfy the first element. "In assessing notice under the FMLA, the critical question is whether information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." Ode v. Mount Sinai Med. Ctr., 2006 U.S. Dist. LEXIS 41479 (S.D.N.Y. June 22, 2006) (quoting Walton v. Ford Motor Co., 424 F.3d 481, 486 (6th Cir. 2005)) (internal quotation omitted).

It is undisputed that plaintiff never actually requested leave, rather he freely and voluntarily determined not to submit the leave form because, according to him, taking leave was "just a glimpse of an idea." (Fischer Dep. 208:18-209:14.) Nor does plaintiff claim he was in any way dissuaded from asking for leave. (Compl. ¶ 47, 50.) Therefore plaintiff's retaliation claim based on his request for leave forms must fail as a matter of law, because he cannot establish the first element of his prima facie case. See Celotex Corp., 477 U.S. at 327.

To the extent plaintiff now contends that the issuance of disciplinary charges against him amounts to retaliation for the filing of the instant action, the Court will assume, without deciding, that plaintiff can establish that filing a complaint, in part to enforce FMLA rights, constitutes a protected activity under the FMLA. The issue was not briefed by either party. However, assuming *arguendo* that plaintiff can establish the first element of his FMLA retaliation claim, he has failed to adduce sufficient evidence for a reasonable juror to find a causal connection between the filing of this action and the disciplinary charges preferred against him in December

2006. See, e.g., Potenza v. City of New York, 365 F.3d at 169.

In support of his claim, plaintiff relies principally on the temporal proximity between the complaint (filed August 16, 2006; signed waivers of service returned October 26, 2006 and November 15, 2006) and the issuance of disciplinary charges (December 6, 2006). (See Pl.'s Opp'n 19.) However, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001), cert. denied 534 U.S. 951 (2001).

Indeed, the timing of this action tends to undermine plaintiff's retaliation claim in that disciplinary charges were only preferred against him following *two years* of progressive discipline for a variety of infractions, ranging from sleeping in class to insolence toward superiors to allegations of corporal punishment and verbal abuse of students. "Where, as here, discipline was already underway prior to the protected activity . . . the Second Circuit has held that temporal proximity alone is insufficient to make out a prima facie case." White v. Eastman Kodak, No. 06-6493, 2009 U.S. Dist. LEXIS 45335, at *32 (W.D.N.Y. May 29, 2009) (citing Slattery, 248 F.3d at 95 (2d Cir. 2001) (no inference of causation where alleged adverse action occurred after "an extensive period of progressive discipline which began . . . a full *five months prior* to [plaintiff's] filing of the EEOC charges") (emphasis in original)). As of August 16, 2006, plaintiff had already received two "Unsatisfactory" annual reviews (see Defs.' Exs. Y, LL) and, beginning on May 25, 2006, i.e. three months *before* he filed this complaint, plaintiff was already assigned to the "rubber room" pending investigation of the same charges he now cites as the adverse action giving rise to his retaliation claim. (Pl.'s Ex. 11; Pl.'s Opp'n 19.)

15

In rejecting plaintiff's FMLA retaliation claim, the Court does not overlook the deposition testimony of former Assistant Principal Daniel Albetta. (See Albetta Dep. 9:14-14:5; 18:22-19:8.) On the contrary, Mr. Albetta's testimony concerning Principal Silberman's intense scrutiny of plaintiff, which may have been motivated at least in part because she questioned whether or not plaintiff suffered from a disability, casts some doubt on the legitimacy of the numerous disciplinary actions taken against plaintiff during the 2004-05 and 2005-06 academic years at AHS. (See id.) However, according to Mr. Albetta, Principal Silberman made comments in "cabinet meetings" held between January 29, 2006 and May 2006. (See id. at 18:22-19:4.) Thus Principal Silberman's statements could not have involved an FMLA claim raised several months later. Furthermore, even though Mr. Albetta resigned from his post in November 2006 (see id. at 19:20-21), he did not testify to any discussion of plaintiff's FMLA claim, in cabinet meetings or otherwise, once that claim was in fact pending. Any inference that Silberman's alleged comments could establish a causal connection between plaintiff's FMLA claim and the § 3020-a proceeding is simply too remote to raise a genuine issue. More fundamentally, even considered in conjunction with the timing of the disciplinary charges, it is indisputable that Principal Silberman's alleged statements do not relate to the central issue in any FMLA retaliation claim: the exercise of a protected activity under the FMLA.

Furthermore, insofar as Mr. Albetta's testimony may tend to undermine the legitimacy of more than two years of progressive discipline culminating in the § 3020-a proceeding, the findings of the Hearing Officer demonstrate that many of the alleged infractions were in fact substantiated. At a minimum, the Hearing Officer's decision refutes plaintiff's assertion that the disciplinary charges were unfounded. See Roemer v. Bd. of Educ., 290 F. Supp. 2d 329, 333

16

(E.D.N.Y. 2003), aff'd, 150 F. App'x 38, 39 (2d Cir. 2005), cert. denied, 127 S. Ct. 370 (2006) (giving evidentiary weight to the administrative hearing findings).

Additionally, though not determinative here, because the Hearing Officer's decision followed a full and fair hearing, including representation by counsel, an opportunity to be heard and to challenge the Hearing Officer's findings (see, e.g., Def.'s Ex RR 2-3), plaintiff is likely estopped from collaterally attacking the content of those findings. See Kosakow v. New Rochelle Radiology Associates, 274 F.3d 706, 728 (2d Cir. 2001) (to invoke collateral estoppel under New York law, defendants must show an "identity of issue which has necessarily been decided in the prior action and is decisive of the present action") (citing Schwartz v. Publlic Adm'r, 24 N.Y. 2d 65 (1965)). "Collateral estoppel, also termed issue preclusion, applies to administrative adjudications, including 3020-a hearings." Roemer, 150 Fed. Appx. at 39 (citing Burkybile v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist., 411 F.3d 306, 310-12 (2d Cir. 2005)). "In order for preclusive effect to attach to issues or facts adjudicated in administrative proceedings . . . an issue must have been raised, litigated, decided, and necessary to the decision issued." Id. (citing Ryan v. New York Tel. Co., 62 N.Y.2d 494, 499-502 (1984). In this case, while plaintiff (curiously) did not appear to contest the disciplinary charges preferred against him *as retaliatory* during the § 3020-a proceeding, the appropriateness and validity of those charges was nevertheless a sine qua non of the Hearing Officer's finding that many of the charges were substantiated. See Burkybile, 411 F.3d 306 at 313 (declining to "take as decided" constitutional claims not raised at the § 3020-a hearing, but accepting the hearing officer's determination that just cause existed for dismissal). Therefore, while the Court does not conclude that the § 3020-a decision precludes plaintiff's retaliation claim as such, plaintiff also

cannot in good faith dispute the content of the substantiated charges or that they justified disciplinary action.

In sum, plaintiff cannot make out a prima facie case of retaliation because he cannot show a sufficient causal connection between the exercise of a protected activity under the FMLA and the disciplinary charges preferred against him in December 2006. The Court accordingly grants defendants' motion for summary judgment with respect to plaintiff's retaliation claim.

## B. Plaintiff's Failure to File a Timely Notice of Claim

Plaintiff makes two arguments in opposition to defendants' claim that he failed to file notice of his HRL claims: (1) that the 2002 EEOC charge (which plaintiff withdrew voluntarily) should constitute valid notice; and (2) that the Court should grant plaintiff leave to file a late Notice of Claim. Frankly, we fail to see the slightest merit in either of plaintiff's arguments.

Section 3813 provides in relevant part:

> No action or special proceeding, for any cause whatever, . . . shall be prosecuted or maintained against any school district . . . unless it shall appear by and as an allegation in the complaint . . . a written verified claim upon which such action or special proceeding is founded was presented to the governing body of said district or school within three months after the accrual of such claim.

N.Y. Educ. Law § 3813[1].

First, timely *service* of an EEOC charge *upon the school district* can satisfy § 3813. See, e.g., Kushner v. Valenti, 285 F. Supp. 2d 314, 316 (E.D.N.Y. 2003). *Filing* (and then withdrawing) a charge of discrimination *years* before the events forming the basis of a state law discrimination claim will not do.

Second, while § 3813 (2-a) allows the Court to grant an extension for filing notice, the extension cannot "exceed the time limited for the commencement of an action by the claimant."

N.Y. Educ. L. § 3813 (2-a). State and City discrimination and retaliation claims carry a one-year statute of limitations. Id. § 3813; Amorosi v. South Colonie Independent Central School District, 9 N.Y. 3d 367 (2007). "[T]he filing of the notice of claim [does] not toll the statute of limitations . . . ." Field v. Tonawanda City Sch. Dist., 604 F. Supp. 2d 544, 576 (W.D.N.Y. 2008) (citing authorities).

Accordingly, plaintiff's HRL claims are barred as untimely under § 3813[1] and the Court is without jurisdiction to grant plaintiff's request for an extension.

IV. CONCLUSION

Plaintiff's FMLA claim must be dismissed because plaintiff cannot make out a prima facie case of retaliation. His remaining claims, brought under State and City Human Rights Laws, also fail as a matter of law because plaintiff failed to file a timely notice of claim pursuant to N.Y. Education Law § 3813. The Clerk is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
September 30, 2009

s/ Judge Raymond J. Dearie

————————————————
RAYMOND J. DEARIE
United States District Judge